**Karen Frances ULANE, Plaintiff,**

v.

**EASTERN AIRLINES, INC., a Delaware corporation, Frank Borman, Thomas R. Buttion, David P. Millett and Robert Shipner, Defendants.**

No. 81 C 4411.

United States District Court,
N.D. Illinois, E.D.

Dec. 28, 1983.

Memorandum Opinion Feb. 8, 1984.

Supplemental Findings March 6, 1984.

Sachnoff, Weaver & Rubenstein, Ltd. by Dean Dickie, Brian D. Roche, Fay Clayton, Chicago, Ill., for plaintiff.

Conklin & Adler, Ltd. by Catherine Tinker, Chicago, Ill., Gambell & Russell by David M. Brown, Atlanta, Ga., for defendants.

GRADY, District Judge.

## TRANSCRIPT OF PROCEEDINGS

(The following proceedings were had in open Court.)

MR. DICKIE: Good morning, your Honor.

THE COURT: Good morning.

THE CLERK: 81 C 4411, Ulane v. Eastern Airlines, case on trial.

THE COURT: I will give you my findings of fact and conclusions of law.

The threshold issue before the Court is whether Title VII of the Civil Rights Act of 1964 applies to transsexuals. The statutory language in Title 42, Section 2000e–2(a) provides that:

"It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex, or national origin."

So the specific question before the Court is whether the phrase, "because of the individual's sex," encompasses a person such as the plaintiff who alleges that she is a transsexual or, alternatively, that having gone through sex reassignment surgery, she is now no longer a man but a woman.

The legislative history of the statute I have just quoted is hardly a gold mine of information. It is summarized in the case of *Holloway v. Arthur Andersen & Company*, 566 F.2d 659 at page 662 (9 Cir. 1977), a Ninth Circuit case, which I cited in denying the motion to dismiss. The Court there said:

"There is a dearth of legislative history on Section 2000e–2(a)(1) which was enacted as Section 703(a)(1) of the Civil Rights Act of 1964. The major concern of Congress at the time the Act was promulgated was race discrimination. Sex as a basis of discrimination was added as a floor amendment one day before the House approved Title VII and without prior hearing or debate."

Well, those who have looked a little further into the matter know that this amendment introducing sex into the picture was a gambit of a Southern senator who sought thereby to scuttle the whole Civil Rights Act, and, much to his amazement and no doubt undying disappointment, it did not work. We not only got an act including race discrimination, which he had sought to bar, but we got sex as well. The question we are confronting here today is: What did we get when we got sex?

I have previously held in denying defendants' motion to dismiss that I believed the complaint adequately alleged that the discharge was related to sex or had something to do with sex. I continue to hold that layman's reaction to the simple word and to the facts as alleged in the complaint. Most of the cases and perhaps all of the cases which have addressed this issue have held that the statute does not apply to transsexuals. I think, however, all of those cases were decided on motions to dismiss, and, in

any event, I think none of them was decided on a factual record as complete as the one we have here.

Those who argue that the legislative history indicates a lack of intention on the part of Congress that the Act would apply to transsexuals cite the unsuccessful attempts to amend Title VII in later years to include protection for homosexuals and transvestites. I think that argument is invalid. There is in the record before us evidence which makes quite clear that there is a distinction between homosexuals and transvestites on the one hand and transsexuals on the other.

Homosexuals and transvestites are not persons who have sexual identity problems. They are content with the sex into which they were born. Transsexuals, on the other hand, are persons with a problem relating to their very sexual identity as a man or a woman. I believe on that basis the situation of a transsexual is distinguishable.

I have no problem with the idea that the statute was not intended and cannot reasonably be argued to have been intended to cover the matter of sexual preference, the preference of a sexual partner, or the matter of sexual gratification from wearing the clothes of the opposite sex. It seems to me an altogether different question as to whether the matter of sexual identity is comprehended by the word, "sex."

Prior to my participation in this case, I would have had no doubt that the question of sex was a very straightforward matter of whether you are male or female. That there could be any doubt about that question had simply never occurred to me. I had never been exposed to the arguments or to the problem. After listening to the evidence in this case, it is clear to me that there is no settled definition in the medical community as to what we mean by sex.

I will also put it more tentatively and say that if there is such a settled definition, it was not adverted to by any of the experts who testified at this trial. Plaintiff's witness, Dr. Green, and other witnesses as well emphasized that sexual identity is in part a psychological question. That is to say, it is a question of one's own self-perception: How does one perceive oneself in terms of maleness or femaleness? It is also a social matter: How does society perceive the individual?

Such a problem is not unprecedented in the law or in the specific context of laws prohibiting discrimination. I refer you to an interesting case decided by my colleague, Judge Getzendanner, *Carrillo v. Illinois Bell Telephone Company*, 538 F.Supp. 793. The question there was whether Title VII and 42 U.S.C. Section 1981 applied to Hispanics when those statutes used the word, "race." The Court there pointed out that many Hispanics are white in the same sense that non-Hispanics are white, and yet they perceive themselves to be of a different race, and they are perceived by some others as being of a different race.

Judge Getzendanner remarked at page 795:

"On the issue whether discrimination against Hispanics constitutes discrimination based on race or on national origin, there is a substantial divergence of opinion. Some Courts have viewed such discrimination as based solely on national origin and have dismissed Hispanics' claims under Section 1981. The trend among the Judges of this district has been to consider discrimination against Hispanics as racial discrimination.

"The Courts extending Section 1981 to discrimination against Hispanics have frequently relied on the following dicta from *Budinsky v. Corning Glass Works*, 425 F.Supp. 786, 788, Western District Pennsylvania, 1977. The terms, 'race' and 'racial discrimination,' are subject to a commonly accepted, albeit sometimes vague, understanding. Those Courts which have extended the coverage of Section 1981 have done so on a realistic basis within the framework of this common meaning and understanding. On this admittedly unscientific basis, Hispanic persons and Indians, like blacks, have been traditional victims of group

discrimination, and however inaccurately or stupidly, are frequently and even commonly subjected to a racial identification as non-whites. There is accordingly both a practical need and a logical reason to extend Section 1981's proscription against exclusively racial employment discrimination to those groups of potential discriminatees.

"As Judge Moran explained the issue in Aponte, supra, 'The plain meaning of the statute, Section 1981, attempts to remedy different treatment of whites and non-whites. Because Hispanics are frequently identified as non-whites, this Court believes that the scope of Section 1981 is broad enough to extend to that group.' "

Judge Getzendanner concludes that it is necessary to consider each case on its own merits and determine whether the particular Hispanic plaintiff was subjected to race discrimination, which would not necessarily be determined by the actual color of his or her skin.

Now, that case is not, of course, precisely applicable here, but it is illustrative of the fact that the things we think we know we do not necessarily know and that people sometimes react to other people according to stereotypes, misperceptions, and other motivations which are arguably discriminatory and are arguably redressable under statutes which might not be thought ordinarily to apply to those situations.

■ Title VII is a remedial statute which is to be liberally construed. That fact, I think, is well accepted and not irrelevant to the inquiry before us. The only defense witness I can recall who argued with or contradicted the proposition that sex is at least in part a question of self-perception and a societal perception was Dr. Wise. He stated flatly that sex is chromosomal. That creates a dispute in the evidence, but it is a dispute which I resolve against the defendant because I do not feel comfortable relying upon the testimony of Dr. Wise. He was a remarkable witness. He stated that the plaintiff is beyond a shadow of a doubt a transvestite. This is a man of science who had never seen the plaintiff, who knew very little about her, who had not even read all of the records pertaining to her, who had read very few of the recent records which seemed to me to be very important, who had read some of the literature in the field but stated that he disagreed with other literature even though he had not read it, and who stated that he knows beyond a shadow of a doubt—those are his exact words—that this plaintiff is a transvestite and not a transsexual.

I have been listening to witnesses for many years, and I have never heard an expert witness state that he was sure of anything beyond a shadow of a doubt. That was typical of Dr. Wise's testimony. That is the most egregious example that I can think of from his testimony, but it is by no means atypical of the tenor of his testimony.

I can tell you quite candidly that I attach no weight whatever to his testimony and, other things being equal, would be inclined to believe that the opposite of anything he testified to would be more probably true than not true. I am not using that method, however, to arrive at my factual conclusions in this case because there is an abundance of other evidence for me to refer to.

On the question of the reaction of society to transsexuals, I believe the Illinois statute is pertinent. Plaintiff has under the laws of the State of Illinois been issued a new birth certificate with a sex designation of female. This is a statute that was enacted by the people of the State of Illinois. This to me is pretty strong evidence of a social policy in this area.

While I do not agree with plaintiff's argument that that statute makes the plaintiff a female or that the statute has some sort of binding effect in a federal civil rights action, I do think that the enactment of the statute is a circumstance which is pertinent to the question of plaintiff's sexual identity and the larger question of whether sex is a cut-and-dried matter of chromosomes.

██ I find by the greater weight of the evidence that sex is not a cut-and-dried matter of chromosomes, and that while there may be some argument about the matter in the medical community, the evidence in this record satisfies me that the term, "sex," as used in any scientific sense and as used in the statute can be and should be reasonably interpreted to include among its denotations the question of sexual identity and that, therefore, transsexuals are protected by Title VII.

I will say now as I said at the time I denied the motion to dismiss that, if I can borrow a phrase, there is not a shadow of a doubt that Congress never intended anything one way or the other on the question of whether the term, "sex," would include transsexuals. The matter simply was not thought of. It was not discussed. Nothing was discussed that we have any record of that would have any relevance to the question before us. But I believe that working with the word that the Congress gave us to work with, it is my duty to apply it in what I believe to be the most reasonable way. I believe that the term, "sex," literally applies to transsexuals and that it applies scientifically to transsexuals. That there is room for argument on the question does not release me from making a decision one way or the other, and I have made the decision which seems to me to be the one most consistent with the factual record that was developed in this case.

██ I turn now to the second question, and that is whether the plaintiff is a transsexual. The defendant argues that she is not a transsexual, that instead she is a transvestite. If that is true, she is not protected by the statute.

There are a number of things which persuade me that the plaintiff is a transsexual. She was found to be such by the unanimous decision of the Gender Identity Board of the University of Chicago Medical School. It would be difficult, I think, to imagine a more prestigious auspices under which to make a finding of any kind. I am disinclined to overrule that finding on the basis of the testimony I have heard from defendants' witnesses.

I found Dr. Berger a very credible witness. Although he was called as a witness by the defense, his testimony was, of course, favorable to the plaintiff. He was her doctor. He was perhaps primarily in charge of her case. There is no doubt whatever in Dr. Berger's mind that plaintiff was and is a transsexual. I believe that he is eminently qualified to make that determination. Plaintiff meets the criteria of the DSM III, the recognized definitional standard for judging transsexuality.

The defendant argues with these determinations and says that what has happened here is that plaintiff managed to persuade these eminent medical practitioners by means of retrospective distortion. In short, as Dr. Arbitt said in his deposition, the plaintiff conned her way into the operation. I understand that it is the defendants' position in this trial that some of that distortion may even have been inadvertent and unconscious, but, nonetheless, it is the defendants' position that in large part the plaintiff through a facile manipulation of these medical persons managed to get for herself this operation in 1980 that she had been denied in 1970.

Dr. Berger said something that struck me as important. He was asked whether he relied upon what plaintiff said, and his response was, "I did not rely only on what she said." If anything is true in this case, that is true.

This takes us to an analysis of the person we are dealing with. At the time of this irreversible decision, the plaintiff was 38 years old. She had had two marriages. She had experienced the pleasure and the happiness to the extent she was able to do so of marriage and fatherhood and certainly was well aware of what she would be foresaking irretrievably if she subjected herself to this surgery. She had more than the ordinary understanding that a patient would have prior to undergoing surgery. Most of us put ourselves in the hands of doctors and hope for the best. This was not true in the case of plaintiff. She knew

more about this subject matter from a scientific point of view than many psychiatrists, if not most psychiatrists, and certainly more than most physicians.

Now, the defendant says this is an arrow in its quiver. Because she knew so much, she was able to dissemble. That is one interpretation of the evidence, and it is one possibility. But the inference I draw from plaintiff's sophistication in the question of transsexuality and sex reassignment surgery is that she had a complete, or as complete as can be, understanding of the pitfalls of an unsuccessful adjustment to the life of a female after transsexual surgery. She had undoubtedly read of those examples, which, in fact, are quite few, of sex reassignment patients who had decided later that they made a mistake, and some of them came to a bad end.

The plaintiff is in the upper range of intelligence. She certainly was capable of understanding all of the implications of what it was she was doing. Those implications did not merely extend to her physical well-being, her psychological well-being, the question of whether she was going to be miserable or relatively happy for the remaining 40 or so years of her life, but they extended to the very subject matter of this lawsuit. The plaintiff undoubtedly knew that she was asking for trouble in terms of her continued employment if she were to have this surgery. That, of course, is why she did not volunteer this information all these years. She anticipated the very reaction that did indeed eventuate. She is accused of having poor judgment in failing to make these disclosures. I will get to that in a while. One cannot accuse her of being incapable of making fairly accurate predictions about what was going to happen. She lost her job, and before she had this surgery, she knew that that was a very good possibility. She went ahead and had the surgery anyway knowing that by doing that she would jeopardize something she truly does love, her job flying an airplane.

Now, I do not know what it would take to convince defendant that a person who undergoes so radical a procedure as the one that was involved here, knowing all of the dangers and all of the trouble that it would and might involve, did not do it for some ulterior purpose. Defendant suggests that plaintiff did not really believe she was a transsexual. She believed she was a transvestite and, therefore, was virtually certain to have an unsuccessful, if not disastrous, post-operative course; she anticipated that she would lose her job and have to fight in Court to get it back, with a very uncertain result, and yet for some reason she saw fit to pull the wool over the doctors' eyes and have this operation. That just is not a reasonable proposition, and yet that is what the defense is in this case in large part.

Harking back to what Dr. Berger said, he said, "No, I do not rely on just what she says." What he meant was he relied on what she did, and I, too, rely on what she did in order to make my determination as to whether she was a true transsexual, which, after all, is largely a matter of her own attitude, her own belief about herself, or whether, on the other hand, she was not a transsexual but an aging and dissembling transvestite. I find that she was and is a transsexual.

The fact that she took a long time to make up her mind and that there were many changes of mind and reversals and uncertainties in the process is not, as defendant would have me believe, evidence of the plaintiff's insincerity and evidence of the mistake that plaintiff made in ultimately having the surgery; rather, it is to me a scenario of what typically happens in any scientific endeavor. It is a matter of trial and error, and it is a matter of checking and rechecking. It is a matter of going back to the drawing board.

There was nothing about plaintiff's history that causes me to feel that I am in a position to second-guess the University of Chicago Gender Identity Board on the question of whether plaintiff was a transsexual and should have had this operation.

Dr. Berger originally thought plaintiff was not a transsexual but eventually

changed his mind. That did not to him indicate that there was any reason not to have the operation and not to classify plaintiff as a transsexual, and there is not anything in the definition of a transsexual which precludes the element of doubt; but those doubts were resolved before the surgery, and I might say that the fact that there were only seven months of the real life experience as opposed to a year or two years is to me absolutely immaterial. It was a matter of economic necessity that the plaintiff proceed with this matter and get back to work if that were possible. Waiting any longer would have simply been biding time for no purpose. All of her physicians were satisfied that she had spent a sufficient length of time to indicate that she could successfully live as a woman and that the surgery was proper.

It seems to me that one of the many unreasonable positions Eastern takes in this case is that plaintiff did not try to live as a woman in her job. She had been fired from her job just as soon as she had the surgery. Apparently Eastern would have me believe that if Ken Ulane had shown up for work in a dress and boarded the plane that there would have been no problem at Eastern. Now, if Eastern means, well, she should have done it in some other job, she did do it in whatever other job she could find. How much that proved I do not know because it was not the job that she hopes to regain. Where she could have found a job as an airline pilot cross-dressing as a woman and maintain that job for a period of a year is something which leaves me totally mystified.

Another consideration on whether plaintiff is a true transsexual is the post-operative course. It has not been a long time. It has been three years. To the extent that plaintiff has had an opportunity to demonstrate a successful post-operative course, she has done so. Her adjustment has been remarkably good. She testified without contradiction that she is a member of her community and is relating well to other people of both sexes, active in her church, in fact, vice president of her church having been elected to that position by co-parishioners who know of her situation. What more can she do? She is not flying an air liner, but Eastern will not let her fly an air liner, nor will anybody else in the present circumstance.

Eastern's medical witnesses would never be satisfied with the post-operative course. If we were in here 30 years from now and there had not been a single problem that could be demonstrated, they would still take the position that you cannot tell about tomorrow.

Another factor which I think is relevant is how plaintiff appears to other people. I have the psychiatric reports and the testimony of the various psychiatrists as to how plaintiff appears to them. She appears to them to be a woman. She conducts herself as a woman. She dresses as a woman. There is nothing flamboyant, nothing freakish, about the plaintiff. It would take an extremely practiced eye, it seems to me, to detect any difference between the plaintiff and the biological woman. My observation of her in this courtroom and on the witness stand leads me to concur with those witnesses who have said that she appears to be a biological woman. That, I think, has a bearing on the likelihood of her successful post-operative course.

It also has a bearing, it seems to me, on the question of whether she is a transsexual in the first place. There has been no reversion to any masculine behavior that we have any knowledge of. Eastern, of course, has studiously avoided making any examination of the plaintiff, or having her tested, having their own psychiatrist examine her as they do in the case of other employees with psychological problems. They prefer instead to say that the post-operative course is unknown and that the path is fraught with danger.

The third question is whether the plaintiff was discharged because of her transsexuality, which is another way of asking whether she was discharged because of her sex. The question, of course, is not whether sex was the sole cause of her discharge. The question is whether it

was a motivating factor but for which she would not have been fired. There may have been other causes. I will deal with that as I go along. But assuming there were, if she would not have been fired but for her transsexuality, the statute has been violated.

There are two unusual aspects to this case. Well, I suppose there are many, but two that are immediately relevant to the present inquiry. The first is that the transsexual surgery is what triggered the firing. That is the very thing that is in issue in the case that is undeniably the initial occasion for the inquiry which led to the discharge. Plaintiff had been employed by Eastern as an airline pilot for 12 years and had performed successfully. As Captain Causey said, she was better than an average pilot, and if they are not good, they do not keep them. So in saying that she was better than average, that means she was better than good.

The first inkling of any discharge was when she had this surgery. So that differentiates this case from the usual Title VII case where the defendant says there were many things in the background of this employee which explain the discharge other than race or sex or whatever might be involved. Here there is not anything in the background other than the matters which first arose when plaintiff had the sex reassignment surgery.

The second unusual feature of this case is that the discharge was managed and coordinated by the defendant's legal department, which carefully drafted the two discharge letters in an obvious attempt to avoid liability under the sex discrimination law. You had here a filtering process that you do not ordinarily have when a disciplinary action is taken against an employee. There is usually a foreman without a lawyer at his elbow who does the dastardly deed, and then we argue about why he did it. Here the lawyers were in charge from day one and screened everything that happened, in fact, literally pulled the strings throughout the entire case.

I refer to the lawyers in Eastern's legal department. I have nothing but admiration for the conduct of Eastern's trial counsel in this case.

The defendant has attempted to articulate nondiscriminatory reasons which, unless pretextual, would justify the firing. What I want to do now is to take the two discharge letters and go over them item by item to see whether or not plaintiff has proved in each instance by the greater weight of the evidence that the particular reason was pretextual.

Turning to the first discharge letter dated April 24th, 1981, the first reason was that the continued employment of plaintiff as a pilot was inconsistent with the safety considerations which underlie the so-called coordinated crew concept of Eastern. The law requires, first of all, that the defendant articulate a reason for the discharge. I do not believe that the defendant has even articulated a rational reason for the discharge. Articulate means more than simply to recite by rote; it means to state in a comprehensible and rational way so that the meaning of the statement can be understood.

The question at issue here is the relationship of the plaintiff's transsexuality to any legitimate safety consideration. It is that relationship which first has to be articulated, and then we get to the question of whether the articulation is a pretext. In my view, we do not even get past the first hurdle in this case.

You will recall how I tried to have Dr. Millett and Captain Causey explain to me what Eastern means by this safety consideration in relation to the coordinated crew concept. Those questions were not in the script, and they were not very good at ad libbing. As I sit here now, I still do not know what any such actual relationship could be. We broke it down a little further into the question of trust. Trust about what? What did I get but more coordinated crew concept, underlying psychological problems, pat phrases which have been programmed into the defense in this case but which have no factual basis.

Eastern went out of its way not to learn whatever could be learned in plaintiff's favor on the question of safety. Its primary source of information was a psychiatrist who has had absolutely no experience with adult transsexuals and who continues to this day to be largely ignorant of that area of psychiatry, and I refer to Dr. Kelly.

Dr. Millett, who knows nothing about the subject, talked to Dr. Kelly, who knows next to nothing about the subject, and got from Dr. Kelly the name of Dr. Meyer, who knows a lot about the subject, but who in a fairly short telephone conversation with Dr. Millett, if it took place, could not have told Dr. Millett that plaintiff constituted a danger in the cockpit of an airplane. There is not even any such contention. The only contention is that Dr. Meyer said that the surgery was still experimental and not a cure for the underlying psychological problem.

Eastern took it from there and conjured up all sorts of dangers that inhered in the so-called underlying psychological problems. It was not even a matter of their putting the burden of proof on the plaintiff. They never gave plaintiff any kind of a fair hearing, never gave her any opportunity to show that they were wrong, or that even if as a general proposition there might be some reason for concern that that concern did not apply to her particular situation.

Eastern from the outset here took the attitude that its mind was made up, and it did not want to be confused with the facts. It substituted for any kind of investigation worthy of the name a prejudiced, close-minded predetermination of the question of whether plaintiff was suitable to continue in the cockpit of one of their air liners.

I am not going to go through the testimony of these witnesses. I merely invite anyone who is curious to read with attention the testimony of those witnesses who sought to explain or, I think more properly, who sought to avoid explaining because they could not explain the relationship between any legitimate safety concern and plaintiff's transsexualism, the plaintiff's surgery or anything else about the plaintiff's medical or psychological condition.

Everybody passed the buck. The legal department wrote the letter. They did not show up to testify, but Captain Button said he relied on them to find out whether the drugs that plaintiff was taking were dangerous. He assumed, testified Captain Button, that the medical department had determined that the hormones plaintiff was taking were not approved by the FAA. He relied entirely on the medical department and on the legal department. The medical department in turn relied upon the information I have already described.

The safety concerns that Eastern purports to have been cognizant of appear to be readily dispelled when confronted with the facts. I give you a dramatic example: Captain Shipner. If ever there was a witness who entered this courtroom convinced that plaintiff did not belong in a cockpit, it was Captain Shipner, who did not make the decision, incidentally, and by saying he was convinced, I do not mean to say that Eastern was convinced. Eastern was not convinced at all, but a lot of things that Eastern did have served to convince some of its employees that there is something wrong with plaintiff that precludes her from flying. Captain Shipner testified that he was very concerned about these hormones that the plaintiff was taking, but then he said: Well, if it turned out that those hormones had been prescribed by a physician, he would have no problem with it at all.

I think we could make a believer out of Captain Shipner if we had a little more time, but Eastern never took the time and was not interested in taking the time.

Captain Helms, another non-believer, testified that the reason he was concerned with the plaintiff's truthfulness and why he felt that her lack of truthfulness would be devastating as far as crew coordination was concerned was that she had been taking drugs which affected her ability to fly. He said, and I believe this is an exact quote:

"If I knew someone was taking heroin, I would not let them in the cabin."

Now, here is one of the most distinguished captains of Eastern Airlines who apparently believed before he came into this courtroom that there was a legitimate comparison between someone who is taking heroin and someone who is taking the female hormones that the plaintiff was taking. He went on to say in further testimony that if he knew there were no side effects or adverse reactions, then it would not bother him that plaintiff had been taking hormones. He said that if all plaintiff is taking is Ovulen-21, that changes his answer altogether as far as his concern about truthfulness on the question of drugs is concerned.

What would have happened here if instead of taking the negative ostrich-like position that Eastern took it had taken a positive constructive attitude toward this problem and attempted to solve it intelligently by investigation and education rather than by denial and pretext? What would have happened?

I think that the testimony of Captain Lewandowski, who testified as the plaintiff's rebuttal witness, is very credible. I think it speaks extremely well for the character of such a man to have befriended plaintiff, taken her into his home, fully realizing the attitude of Eastern and fully realizing the attitude of some of the other pilots. That, as I say, reflects well on his character in my view, and I find him otherwise to be an extremely credible witness. He said that the present situation is that there is a small group of pilots who are dead set against the plaintiff, and there is a small group like himself who are very strongly in favor of her. He said that the vast majority of pilots are waiting to see what happens, and he believes that they believe in the system. If the system represented by the FAA says she is fit to fly, that would be good enough for them.

That strikes me as credible testimony, far more believable than the testimony of people like Captain Helms and Captain Shipner who predict dire consequences should plaintiff return to the cockpit, but whose testimony falls apart as soon as you start confronting them with the facts. I think those witnesses, Captain Shipner and Captain Helms, do not take the attitude: Do not confuse me with the facts. They strike me as being willing to listen to the facts, and I have no doubt whatever that that attitude is characteristic of the vast majority of Eastern pilots who, after all, have to be highly intelligent and resourceful individuals, and I emphasize the word, "individuals," to hold the responsible jobs that they do. I think if they are given the facts and had they been given the facts initially, there would have been no problem here.

I conclude that reason number one, first of all, is not articulated in any sense that I understand that word, but even if we get over that and get to the question of whether it is a pretext, is a pretext. It is a sham of the first water.

Let's go to the second reason: that plaintiff's first class medical certificate is not unconditional. Even Dr. Millett agreed in this courtroom that plaintiff's certificate is substantially the same as the certificate issued to alcoholics. I so find. It seems to me substantially identical. Any differentiation that I heard amounts to a mere quibble.

It is interesting to trace the origin of the requirement that there be any follow-up at all on plaintiff's certificate. The origin was the anticipated unfavorable reaction of the Eastern crews which might in turn cause emotional problems for the plaintiff. Here we have Eastern doing its best to drum up the very kind of adverse crew reaction that motivated the limitation in the first place, using that limitation as a reason for disqualifying the plaintiff.

You will note that Dr. Haynes before recommending the follow-up says quite clearly that he knows of no reason at all that the plaintiff is not qualified to fly the airplane. His concern is not with any emotional problem the plaintiff might have if she is left alone but, rather, with some response that an unfriendly treatment at

the hands of fellow crew members might cause.

Eastern has not changed its mind about the plaintiff even though she now has an unrestricted first class medical certificate. There is no retreat from this particular reason. Dr. Hutson testified from this stand the other day that the FAA is wrong. He does not pay any attention to that unrestricted first class medical certificate. The FAA does not know what it is doing. It is not following its own rules. Dr. Hutson is an example of one of the Eastern witnesses who, by his own admission on the witness stand, could never be convinced by any evidence whatsoever that plaintiff is fit to fly the airplane. I find that reason number two is a pretext.

Reason number three was that surgery does not solve the underlying psychological problem and that the surgery was unproven and experimental. We have an articulation problem again because there is a total failure to relate this concern to any question of cockpit safety. Let's assume the surgery does not work. Let's assume that it does not do anything about the underlying transsexuality which is the underlying psychological problem. How does it follow that plaintiff would be a less safe pilot than she had been for the preceding 12 years when as a transsexual she safely piloted Eastern airplanes?

Even Dr. Meyer, who has a jaundiced view of reassignment surgery, says that on the average the worst that can happen is that there is no improvement. It does not make them any better, it does not make them any worse. He tends to ignore the substantial body of medical literature which supports the proposition that sex reassignment surgery has on the whole been successful in alleviating the anxieties and the depressions that transsexuals without the surgery frequently have. Perhaps ignore is the wrong word. He simply disagrees with the conclusions of these other experts in the field.

Even Dr. Meyer, whose views are certainly in the minority, does not support the view that an unsuccessful surgery leaves the patient worse off than he or she was before the surgery.

It should be noted that the surgery is not designed to cure anything. The person after the surgery is still a transsexual. So it does not cure the transsexuality. It is hoped that the person will be more comfortable and lead a happier life, but the most energetic supporter of the surgery would have to concede that even where that happens, the person who had the surgery still has an underlying problem. He is walking around with a sexual situation that he or she was not born with.

Now, if that is what is meant by not solving the underlying problem, nobody can argue with that. What Eastern failed to articulate here is what underlying problem there is other than the mere fact of transsexuality. Try as I might, try as counsel for the plaintiff might, we could not worm it out of anybody. I sat and listened to Dr. Kelly for a couple of hours repeat the same rote response about underlying psychological problems, the nature of which he does not know but he is sure exist and he is sure constitute a safety hazard.

The other thing that I think is important about reason number three is that Eastern made no effort whatever to determine what the particular situation was in plaintiff's case. They simply did not have enough information to take the position that they did; namely, that you can categorize transsexuals across the board as persons who would represent a safety problem in a stressful situation. That generalization is no more true of transsexuals than it would be true of people who are left-handed or who are dyed-in-the-wool Republicans. It is no escape from that fact to say, "Well, we just do not know." Ignorance, prejudice, discrimination, and hatred have throughout history been justified by, "We do not know; we cannot take a chance." I think that one of the things that Title VII sought to accomplish was the elimination of that kind of attitude.

This might be a good point for me to comment generally on the medical witnesses in this case. I went through my notes

last night very carefully, and I did in this case what I usually do. I make my own notes of my impressions of the witnesses as we go along: Are they credible? Do they seem to me to be telling the truth? Are they reliable? My reaction to each and every plaintiff's medical witness was positive. My reaction to each and every defense medical witness was negative.

Now, I am considering in that connection Dr. Northrup and Dr. Berger to be plaintiff's witnesses even though they were called by the defendant. There was just a difference in the caliber of person. Dr. Meyer, Dr. Millett, Dr. Wise, Dr. Kelly, and Dr. Hutson are, in my view, contemptuous of transsexuals. There runs through their testimony an intolerance and a prejudice that is palpable.

Dr. Millett, Dr. Kelly, and Dr. Hutson seem to me to have an additional aspect to their testimony; that is, they somehow resent the intrusion of a transsexual into the aviation field. They seem to think that the respectability of aviation is compromised by the presence of a transsexual. That, incidentally, is an attitude that permeates the testimony of virtually all the defense witnesses who are associated with aviation. I find that item number three is a pretext.

Turning to item four, Eastern says that having plaintiff in the cockpit would counteract their efforts to assure the public that airline travel is safe. Well, that argument, of course, is no better than the proposition that a transsexual in the cockpit makes airline travel unsafe. It falls with the other pretexts, and that is what it is. There is no evidence of a lack of safety. There is no evidence of any rational belief on the part of Eastern that there is a safety problem.

This is the kind of argument that opponents of civil rights litigation urged back in those long-ago days when we did not have anti-discrimination laws. We cannot serve blacks in this restaurant. Nobody will come in. We cannot employ a black to drive this bus. Nobody will ride the bus. We sure can't have any blacks carry the mail or work in a department store. We will lose customers.

Well, the American public is a lot smarter than the bigots gave them credit for being, and those predictions did not prove to be true. I am old enough to remember when there were no blacks driving buses in Chicago or virtually none, no black sales clerks in department stores, no black mail carriers. We all know the extent to which those jobs have been opened up to persons of all races and sexes and how much better a society it has made us and how the insuperable problems that were supposed to come about just did not happen. The same thing is going to happen should Karen Ulane resume her seat in the cockpit, and it will happen with the help of people of good will like some of the people who testified here in this courtroom.

Item four is a pretext.

Now, item five should probably be included as part of the hand-out material for any seminar on discrimination cases. The fifth reason is that:

"To the extent the operation and the counseling you have undergone have been successful in changing your essential nature from male to female, it has changed you from the person Eastern has hired into a different person. Eastern would not have hired you had it known you contemplated or might in the future contemplate such an action."

Think of the significance of that last statement. Eastern would not have hired the plaintiff. Even in their state of absolute ignorance about what safety implications there might or might not be concerning transsexuality and reassignment surgery, Eastern would not have hired the plaintiff.

I read this as a virtual admission of discrimination, and in my view that discrimination is based on sex within the meaning of the statute.

Item five is also in my view inconsistent with Eastern's position that plaintiff has undergone no sex change. In any event, I find that item five, aside from being evi-

dence of the very discrimination charged, is pretextual.

The final paragraph in the letter says that:

"Each of these grounds represents an independent ground."

That is well and good for Eastern to say, but life does not always work out the way you want it to. In assessing the good faith of each of these separate reasons, the Court considers them together, and it is difficult to be taken seriously on one assertion when you have been shown to be frivolous on another. Now, I have indicated that I think each of these reasons considered alone and independently is a pretext, and that conclusion is heightened by the reciprocal effect these various reasons have on each other when considered together and in the context of this case. On the other hand, I find them no more convincing in combination than I do individually.

Now, why was the plaintiff really fired? What was the real reason? I conclude from the evidence I have heard in this case that Eastern thought it had a real image problem: A transsexual in the cockpit. How is that for you? What are we going to do about that? The public will not accept it. We will be the laughing stock of the airline industry. We have got to do something about it.

Without giving it very much mature thought, Eastern went into action to sever itself from this problem. It probably thought this was the way to solve it, but they took the wrong course in my view. The legal department did the directing, and the medical department did the casting and provided the props.

There has been some testimony about the plaintiff's facade and her dissembling, her manipulation. I find that the real facade and the real dissembling and the real manipulation has been on the part of Eastern Airlines.

I want to turn now to the second discharge letter. I find that the second discharge was not a retaliation for having filed this suit or for having filed the arbitration proceeding. It was, rather, an attempt to bolster the case for discharge. Assuming there was a legitimate reason for discharge, there is nothing wrong with that. As I said yesterday, I think that is the sensible thing to do. If more ammunition comes to your attention during the course of litigation or even if there is no litigation, the sensible thing to do is to avail yourself of it. So I do not hold against Eastern in any way that it sent out the second letter. That letter, however, has to be evaluated in terms of whether it articulates a non-discriminatory reason and whether that alleged reason is or is not pretextual.

Now, the first reason in the letter of March 25, 1982, is that plaintiff failed to disclose to the company her medication and her psychiatric and medical treatment that she had had over the years for her condition. The conclusion that Eastern draws from that failure is that plaintiff, "showed a gross disregard for the safety of your fellow employees and the public at large and a consistent lack of sound judgment."

The first thing to note about this alleged reason for discharge is that the fact of the treatment and the fact of the medication was known to Eastern at the time it wrote the first letter of discharge. Granted, more detail was unearthed as a result of discovery in this case, but no additional detail threw any additional light on the question of whether that medication or that treatment had a causal relationship to any safety concern.

Now, the reason that is assigned in item one is that the alleged failure to report this information earlier showed a disregard for safety and a lack of sound judgment. Well, where is the safety hazard, and if there is no safety hazard, where is the lack of sound judgment? Again, we have a failure to articulate, and we have a failure to provide any substance to the reason given.

The second thing about this reason is that, in fact, the drugs plaintiff was taking were not dangerous. They did not affect her ability to fly. So there is no lack of

sound judgment. It is not merely a question that Eastern has failed to show that they were dangerous. I am satisfied from the evidence here and by the greater weight of that evidence that, in fact, the drugs were not dangerous in terms of either plaintiff's individual ability to pilot the airplane or any effect it might have on the passengers or crew.

Now, the third consideration in relation to item one is that there is disparate treatment here between the plaintiff and the alcoholics, all of whom are male. Captains Shipner and Helms both testified to the conspiracy of silence that there had been for years in regard to alcoholic pilots at Eastern Airlines. Pilots drank and flew. They did not disclose that to the company, obviously. They were not fired, with rare exception. The safety factor with alcohol is not unknown, which is the best Eastern can manage to say about the safety considerations in regard to female hormones. The safety factor with alcohol is well-known. If you are drunk, you do not have the physical or mental ability to fly an airplane or walk a straight line.

Did they fire these alcoholic pilots who had failed to reveal that they were drinking and had an alcoholic problem? No, they did not. But they fired the plaintiff for having taken hormones and having received psychiatric treatment for problems that have not been shown to have any relation whatsoever to safety considerations.

The final thing I consider in connection with item one and, indeed, in connection with the first discharge letter as well is the drastic nature of the discipline which was imposed upon the plaintiff: Discharge—no investigation of any substantial kind, no fair hearing, no opportunity to reform. Discharge. What a difference between the way plaintiff was treated and the way alcoholics and males with other psychological and emotional problems have been treated by Eastern Airlines.

Dr. Jones testified without contradiction that, first of all, large amounts of hormones, if ingested, are simply excreted by the body. He further testified that any ill effects of the long range kind he said could occur, such as heart trouble, if they had not occurred by the time the patient ceased taking the excessive amounts of hormones, they were unlikely to occur later. In other words, any deleterious effect that might be argued to occur from taking more hormones than medically advisable immediately ceases upon the cessation of the over-dosages.

Was any consideration given to telling the plaintiff, "Look, don't take what we regard as excessive dosage of hormones any more," as the alcoholics were told, "Don't drink any more"? No, plaintiff was fired without any opportunity to satisfy any legitimate medical concern that the defendant might arguably have had. The defendant was not interested in giving the plaintiff a chance. The defendant was not interested in investigating or in following its normal procedures because it was afraid of what the results would be. It pretty well knew that those results would not bolster its already-made decision to fire the plaintiff but, rather, would undermine the legitimacy of that decision.

Now, the second reason given in the—

Let me say first that reason number one is a pretext.

Turning to reason number two, Eastern says that:

"The failure to disclose the medications and the psychiatric treatment on the FAA applications for medical certificates shows a consistent pattern of poor judgment and willingness to endanger your fellow crew members and passengers for your own benefit."

Now, I have already indicated why this is not true and why Eastern had no basis for saying that it was true. The hormones were approved by the FAA, and the amounts that the plaintiff was taking did not endanger anybody, and Eastern had no basis for believing otherwise. Eastern has changed its position here at the trial. Its case has continually changed as new information and new theories have occurred or

become known to counsel. At trial the thrust of item number two was that plaintiff is untruthful and, therefore, cannot be trusted to give reliable information, and this actually was the foundation for much of Captain Causey's testimony: She did not reveal the medications. Therefore, how can you trust her in the cockpit?

You will recall how we went around with that and could not figure out a connection between the two things, but that is another point. What is important immediately is that this is not the reason that Eastern gave in the second firing letter. They did not say anything about untruthfulness or lack of trust. They said, "This behavior shows a consistent pattern of poor judgment and willingness to endanger your fellow crew members and passengers for your own benefit," essentially, in other words, the same reason they had given in item one of the second letter. There was nothing said about untruthfulness back at the time of the discharge. That has been added here as further justification at trial.

Now, assuming that Eastern had fired the plaintiff because of untruthfulness or assuming further that whether they did or not they can now rely on it as an additional reason for justifying the firing, we still have the question of whether that alleged untruthfulness is a pretext or not. I find that it is or would be if that were what had been relied upon. The considerations here are, of course, the disparate treatment of male alcoholics. They had certainly been untruthful during the entire time the admitted conspiracy of silence existed. Talk about endangering the flying public, talk about endangering the fellow crew members for your own benefit, talk about a legitimate reason to distrust somebody. How about flying an airplane in an intoxicated condition or with a condition of alcoholism that is untreated, whether or not the pilot may have been drinking immediately prior to take-off.

In considering again the question of untruthfulness, it has to be evaluated in company with its neighbors, all of the other reasons which are clearly pretextual. How likely is it that we find a winner among all these losers? It is possible, but in evaluating the good faith of Eastern, I do not evaluate these reasons in a vacuum one by one.

Now, let's just assume that Eastern really does believe that the plaintiff was untruthful in her FAA applications. In fact, I think it is a very defensible position to take that the plaintiff should have revealed her psychiatric treatment and her medications on the applications. There is an argument the other way. It is clear to me that the plaintiff wanted to keep her job and concluded correctly, as it turns out, that revealing these matters would be very likely to result in the loss of that job for no reason other than the prejudice of her employer.

I do not say that that justifies any intentional failure to divulge relevant information on the application form, and I do not mean to be interpreted as excusing intentional misrepresentation or intentional omission if it is motivated by self-interest. But on the question of judgment considered alone and on the question of whether a real safety hazard was presented, I do not think that the plaintiff used poor judgment in terms of safety concerns by failing to reveal this information. But let's assume otherwise for purposes of argument. Let's assume that she intentionally failed to reveal to the FAA information which she believed they were entitled to have. How does that differ from what the alcoholics did during the conspiracy of silence? The answer is, it does not at all. How does it differ from the failure of any other Eastern pilot with a serious emotional problem who was having psychiatric treatment to reveal that information on his application? It does not.

Here I would like to refer to the case of *McDonald v. Santa Fe Trail Transportation Company*, 427 U.S. 273, at 282, 96 S.Ct. 2574, at 2579, 49 L.Ed.2d 493. This is a case where two white employees were fired for stealing company property whereas a black employee who had been guilty of the same thing was not fired. The Su-

preme Court said this at pages 282 to 283, 96 S.Ct. at pages 2579 to 2580:

"We find this case indistinguishable from McDonnell Douglas. Fairly read, the complaint asserted that petitioners were discharged for their alleged participation in a misappropriation of cargo entrusted to Santa Fe but that a fellow employee likewise implicated was not so disciplined and that the reason for the discrepancy in discipline was that the favored employee is Negro while petitioners are white. [Citation omitted] While Santa Fe may decide that participation in a theft of cargo may render an employee unqualified for employment, this criterion must be 'applied alike to members of all races,' and Title VII is violated if, as petitioners alleged, it was not."

Now, that case was considering the sufficiency of the complaint, but the principle is applicable here. If Eastern Airlines decides to fire pilots who are untruthful concerning relevant medical information on their FAA applications, it must fire them without regard to sex. It did not do so in the case of male pilots. It did do so in from what I can gather the sole instance of a non-male pilot who arguendo was guilty of a failure to disclose. This disparate treatment turns the alleged reason into a pretext on that basis alone.

Now, the third reason in the second letter is that plaintiff allegedly instigated publicity which was designed to embarrass Eastern Airlines. There is no substance whatever to that accusation. The publicity was made inevitable by Eastern's discharge of the plaintiff. Plaintiff had every right to file this lawsuit. Eastern clearly anticipated that it was in for a lawsuit because it geared up for it prior to the discharge, and in view of the unusual nature of this lawsuit, publicity was inevitable.

I have a jury box here that is filled with members of the press who were not brought here by the plaintiff. The press reported the filing of this case extensively at the time it was filed. They did not learn about it from the plaintiff as far as I know.

They learned about it because it was a matter of public record. So there was going to be inevitably a lot of publicity about this case whether plaintiff made herself available to the media or not.

Now, it is true that she has made herself available to the media and to other persons as well, medical persons. She has attended grand rounds with Dr. Berger and contributed to the medical education of doctors and medical students, which I think is commendable. The more that we learn about matters of this kind, the better off we are going to be.

I sat and listened to the television program that emanated from Philadelphia, and I found it to be on the whole a tasteful and educational program. I do not think the plaintiff did anything that was untoward during that interview. She conducted herself properly as did her attorney. The moderator of that program, incidentally, struck me as having a great deal more perception about the problem of transsexuality than some of the medical witnesses who testified in this case. There is no doubt that he was a lot brighter. If there was anything that was damaging to Eastern Airlines about that program over and above whatever damage it might have suffered by the mere instigation of this litigation, it does not occur to me.

Similarly, the newspaper articles that I have read are factual, typical of newspaper articles that are written about any litigation which is of public interest and especially cases that are unusual or even unique in character. In short, much of this publicity was inevitable. Any incremental publicity occasioned by plaintiff's initiation was hardly significant in the total picture. But let's assume that it was. Is this another pretext? Of course, it is.

I will not go into the Playboy Magazine, but we had there nude pictures of Eastern Airlines' employees, which did not bother Eastern at all. They appeared in Playboy Magazine. Here we have one picture of an Eastern First or Second Officer standing beside his wife or, rather, in one picture he is above his wife, and in another picture

immediately below that, here is his wife, an Eastern stewardess, stark naked in a bathtub in Playboy Magazine with a circulation of how many millions, and not a peep out of Eastern. Captain Button, I think it was, is not peeping even now. I suppose that is a terrible pun, isn't it? I did not mean it that way. A clearer example of disparate treatment would be hard to imagine.

The fourth and final reason is that:
    "This notoriety would undermine Eastern's efforts to reassure passengers of the safety of airline transportation."

Here again we have a failure to articulate a comprehensible reason. The relationship between the transsexuality and the publicity about the transsexuality on the one hand and any rational safety concern on the other simply does not appear from the evidence in this case. This ground is plainly and literally nonsense as far as I can tell.

I find in summary that all of the reasons advanced by Eastern for the discharge of the plaintiff were pretextual and were not advanced in good faith.

I further find that but for being a transsexual and but for having had the transsexual surgery, the sex reassignment surgery, and adopting the life style of a woman, the plaintiff would not have been discharged.

I further find that the plaintiff was in almost every instance subjected to discriminatory and disparate treatment for conduct which was in almost every instance, if not every instance, far less serious than that of male alcoholics whose conduct was excused by Eastern.

■ I turn now to the second general question, and that is whether, assuming a sex-based series of decisions on the part of Eastern, those decisions can be justified as bona fide occupational qualifications; that is, can Eastern justify the proposition that not being a transsexual and not having transsexual surgery is a bona fide occupational qualification?

In order to prevail on that theory, on which Eastern has the burden of proof,

Eastern would have to prove, according to the case of *Orzel v. City of Wauwatosa Fire Department,* 697 F.2d 743, Seventh Circuit, 1983, at page 753, "that the challenged sex qualification"—I am inserting "sex" for "age" in this quotation; it was an age discrimination case—"that the challenged [sex] qualification is reasonably related to the essential operation of its business and that either there is a factual basis for believing that all or substantially all [transsexuals] would be unable to effectively perform the duties of [a pilot] or that it is impossible or impracticable to determine job fitness on an individualized basis."

Eastern has proved neither of these propositions. The evidence, on the contrary, proves that neither of these propositions is true.

I am satisfied from this evidence that while some transsexuals, just as some tall people and some left-handers, some fat people, and some Irishmen would not be safe airline pilots, it is true that some transsexuals would not be safe airline pilots. But it cannot be said with any rationality that all transsexuals are unsafe airline pilots.

Neither can it be said with any rationality that it is impossible to make this determination of whether or not a safety hazard is really involved on an individualized basis. Eastern never attempted to do anything on an individualized basis and instead attempted to justify its discrimination against the plaintiff by resort to an indefensible generalization about all transsexuals. They got whatever help they could from plaintiff's individualized record. Wherever they could find something that they could use against the plaintiff, they threw it in, but they blinded themselves utterly to anything in the individualized record which favored plaintiff, which tended to show that she was and would be a safe pilot and, of course, failed to conduct any investigation of any kind that would be likely to reveal the truth in that regard.

I am going to enter judgment for the plaintiff, and the question is on what counts and against which defendants.

Count I alleges that plaintiff was discharged because she is a woman. Count II alleges that she was discharged because she is a transsexual.

I feel more comfortable with Count II. I believe that these are truly alternate theories and that it cannot be both ways. It has got to be one or the other. The evidence much more clearly establishes in my opinion that transsexuals are entitled to protection under the act than it does that an operated transsexual is now a woman. While I would not argue with the latter proposition, the former seems to me more strongly supported by this record.

Accordingly, I am going to enter judgment against the defendants and in favor of the plaintiff on Count II, the transsexual count. In doing so, I do not mean to imply that if Count I were the only count I would not enter judgment for plaintiff on that count. I say that because one never knows "beyond a shadow of a doubt" what the Appellate Courts might do, and in the event the finding on Count II should be reversed, I would want plaintiff to be in the position of arguing alternatively that the judgment should be affirmed on Count I because upon remand in such a situation, I would enter judgment for plaintiff on Count I on the basis of the record that has already been made here.

Now, I believe that judgment is proper on Count II against all defendants but Shipner. It is not clear from the complaint just who is charged in what count, but Shipner is not alleged to have done anything that I can see in Counts I or II. I gather he is in the conspiracy count and some of the other counts later on, but as to the remaining defendants, Eastern, Buttion, Millett—

MR. DICKIE: Excuse me, your honor. I believe it was stipulated that Title VII was against the company.

THE COURT: Against the company only?

MS. TINKER: Yes.

THE COURT: All right, that simplifies matters.

Judgment will be entered against Eastern only.

Now, as I indicated before we started this trial, I believed and still believe that this case will be greatly simplified by a determination on appeal concerning the sex discrimination counts. Either way the case went, the sensible thing to do in my view was to certify the judgment under Rule 54(b). The case is not, however, at this juncture in a posture for such certification because we do not have a final order. In order to have a final order, we cannot have merely a declaration of rights; we have got to have a judgment that is enforceable.

I am going to declare and do declare that the plaintiff is entitled to reinstatement with full seniority from the date of her discharge, all employment benefits that she would otherwise have received had she not been discharged, full back pay, and her reasonable attorneys' fees. What remains to be determined is the amount of the back pay and, of course, the amount of these benefits and her place on the roster, the possible question of mitigation of damages, all of which, it seems to me, will be fairly simple.

It seems to me that much of it can be stipulated to, but maybe not. I do not know. I urge you to get together as you have throughout this case. There has been acrimony, but I think generally speaking counsel have conducted themselves as professionals, and I am sure you will continue to do so, and you can save your clients a lot of time and expense by cooperating in whatever further discovery might be necessary.

Plaintiff's income tax returns, for instance, should be produced on the question of mitigation or whatever other fact they may be pertinent to.

There is one more item I want to cover before I cease these brief remarks, and that is a very important misquotation that occurred in the reported version of my oral opinion when I denied the motion to dismiss. I did not even know it had been reported. Somebody sent it in, and when I

read it the other day in 28 F.E.P. Cases, there is one statement that is the exact reverse of what I said or at least what I meant to say. I am going to read the statement so I can correct it now in the record.

This is at page 1439 of that report. The statement was:

"What does seem to me apparent is that there is no way out of the conclusion that whatever the physiology may be, it has nothing to do with sex as that term is constantly understood."

Now, the word, "nothing," there totally turns on its head what I was trying to say. I am sure that I used the word, "something," and if I did not, that is what I meant to say, and I want to clarify that for future reference.

It is surprising to me that nobody caught that before it was sent in. I think I would have caught it had somebody told me they were going to send it in. I think for whatever good it might do, I will send that correction into the book publisher so that I do not go down in posterity as someone who cannot articulate a reason for a decision.

## MEMORANDUM OPINION

In my oral findings of fact and conclusions of law announced from the bench on December 28, 1983, I expressed an intention to find in favor of the plaintiff on Count II (discrimination against a transsexual) and against the plaintiff on Count I (discrimination against a female). It seemed to me that plaintiff had made a much better case that she is a transsexual than that she is a female. Upon further reflection, I think plaintiff may have made an equally good case on Count I. *See M.T. v. J.T.*, 140 N.J.Super. 77, 355 A.2d 204 (App.Div.), *cert. denied,* 71 N.J. 345, 364 A.2d 1076 (1976); *In Re Anonymous,* 57 Misc.2d 813, 293 N.Y.S.2d 834 (N.Y.Civ.Ct. 1968); *The Law and Transsexualism: A Faltering Response to a Conceptual Dilemma,* 7 Conn.L.Rev. 288 (1975); *Comment, Transsexualism, Sex Reassignment Surgery, and the Law,* 56 Cornell L.Rev.

963 (1971); *Comment, Transsexuals in Limbo: The Search for a Legal Definition of Sex,* 31 Md.L.Rev. 236 (1971). Moreover, if I were to find against plaintiff on Count I, she would be compelled to cross appeal, and this would be anomolous. She has prevailed on her Title VII claim and should not be burdened with having to appeal the rejection of an alternative theory to support the relief granted.

Accordingly, the judgment will be in favor of plaintiff on both Counts I and II of the complaint.

## SUPPLEMENTAL FINDINGS

Plaintiff has moved, pursuant to Rule 52(b) Fed.R.Civ.P., for clarification of the court's rulings in regard to Count I of the complaint. She asks for an indication that the findings supporting the conclusion that plaintiff is a transsexual also support a finding that she is a female and, further, that the findings as to sexual discrimination be made expressly applicable to Count I as well as to Count II.

The basic question in this case is whether plaintiff was discharged because of her sex within the meaning of Title VII. I found that, whether plaintiff be regarded as a transsexual or as a female, she was discharged by Eastern Airlines because of her sex. On the question of plaintiff's exact sexual status, I was satisfied from the evidence that she is a transsexual and so found. If Title VII protects transsexuals, then plaintiff is entitled to the relief awarded. On the other hand, if on appeal Title VII is held not to apply to transsexuals, then plaintiff should have a ruling on her alternative position that she is a female. As an alternative to my finding that plaintiff is a transsexual, I find that plaintiff's post operative legal status is that of a female. If on the evidence presented in this case the choices were limited to male or female, I would and do find that the evidence clearly predominates in favor of the conclusion that plaintiff is a female, not a male. All of the evidence which supports

the view that plaintiff is a transsexual also supports the finding that she is a female.

It was and is my intention that all of my findings and conclusions concerning sexual discrimination against the plaintiff by Eastern Airlines, Inc. apply with equal force whether plaintiff be regarded as a transsexual or a female.